IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EDWARD WOLFE, :
as representative and executor of :
THE ESTATE OF FLORENCE WOLFE :
:
:
v. : Civil No. CCB-10-2606
:
:
CAREFIRST OF MARYLAND, INC. *d/b/a* :
CAREFIRST BLUECROSS BLUESHIELD :

## MEMORANDUM

Plaintiff Edward Wolfe, representative and executor of the estate of Florence Wolfe, filed this breach of contract action against defendant CareFirst alleging that CareFirst's denial of claims for Ms. Wolfe's care in a nursing home during the last years of her life violated her CareFirst issued Catastrophic Health Expense Policy. The parties have filed cross-motions for summary judgment.[1] For the reasons set forth below, the plaintiff's motion will be denied and the defendant's motion will be granted.

## BACKGROUND

In 1986, Florence Wolfe purchased a Catastrophic Health Expense Policy from CareFirst of Maryland. (*See* Policy, ECF No. 126-2.) If covered medical expenses related to an illness or injury surpassed $50,000 in any one year period, the policy covered the next $250,000 in expenses over a two-year period, at which point another $50,000 deductible was triggered, which

---

[1] Apparently unaware of Loc. R. 105.2(c), the parties have each filed separate motions for summary judgment and related briefing. Each party has also filed a surreply to other party's reply memorandum, in part, because the multiplication of briefs created by the double-filing of motions for summary judgment has fractured what issues are addressed in each memorandum. Each party opposed the other's surreply. In the interest of allowing each side to clarify its position on the issues addressed throughout the multitude of briefs, the court will grant each motion for leave to file a surreply. *See* Loc. R. 105.2(a).

1

was again followed by a two-year, $250,000 coverage period. The policy covers all "medically necessary" treatment provided at an inpatient hospital, as well as treatment at an "extended care facility" ("ECF") provided that "admission to the ECF [was] within 14 days of a prior covered hospital stay;" the "prior covered hospital stay was at least 3 days long;" and the treatment at the ECF was "for continued treatment of the same illness or injury for which benefits are eligible." (*Id.* at 11, 20.) The policy also covers mental health treatment. (*Id.* at 19.) However, the policy states, on the cover page, that it "is not a long term care policy . . . This policy is designed to supplement your other health insurance. . . . Custodial care is not covered." (*Id.*) The policy further states that it excludes "services mainly for custodial care or rest cures, regardless of whether the custodial care is ordered by a physician, [or] necessary to maintain the insured's present condition." (*Id.* at 22.) Finally, the policy defines "medically necessary" as "those services and supplies provided by a hospital or practitioner to identify or treat an illness or injury which has been diagnosed or is reasonably suspected and are . . . [among other characteristics] [c]onsistent with the diagnosis and treatment of the insured's condition . . . [and] [t]he most appropriate supply or level of service which can be safely provided for the insured." (*Id.* at 31.)

In 1999, Ms. Wolfe moved into an assisted living facility close to her son, Edward, in Texas. In November 2006, having been diagnosed with Alzheimer's disease, Ms. Wolfe had to be hospitalized for episodes of syncope (fainting) and a fractured right shoulder. (*See* Hospital Records, ECF No. 127-1.) Ms. Wolfe was discharged five days later, and her treating physician, Dr. George Markus, recommended she be transferred to an extended care facility, the Victoria Gardens nursing home, because she could no longer care for herself given the progression of her Alzheimer's. (*See id.*; Markus Dep., ECF No. 128-6, at 42-45,79-81.) In 2007 and 2008, Edward Wolfe filed claims on behalf of his mother for her care at Victoria Gardens. (*See* Wolfe Decl.,

ECF No. 128-7, ¶¶ 2-11.) Wolfe documented claims for expenses well in excess of the $50,000 deductible required to trigger the policy (in fact, Wolfe presents claims surpassing a second $50,000 deductible). (*See id.* ¶¶ 12-14; Exs. A & B.) CareFirst denied these claims, asserting that Ms. Wolfe's treatment at Victoria Gardens was not covered by the policy. CareFirst also disputes the amounts claimed by Wolfe and asserts that, even if the claims had all been applied, the $50,000 deductible still would not have been met.

Wolfe filed a claim with the Maryland Insurance Administration (MIA) challenging CareFirst's denial of the claims. (*See* IPRO Report, ECF Nos. 124-8 & 144.) The MIA ordered an independent review of the claims by a private contractor, IPRO. A report was created by Dr. Francis Foca, an independent medical expert employed by IPRO, who determined that CareFirst was, overall, correct in its denial of the claims because they were mainly for custodial care services related to Ms. Wolfe's Alzheimer's, but that some of the denied claims were for periods of medically necessary rehabilitation treatment following hospital stays for acute injuries and illnesses, including recovery from the initial shoulder injury and from pneumonia. (*See id.*) Dr. Markus, her physician, indicated that he believed Ms. Wolfe's admittance to Victoria Gardens was medically necessary because of her deteriorating mental faculties. (Markus Dep. at 45.)

In September 2009, Ms. Wolfe filed suit against CareFirst claiming breach of contract because of its denial of coverage for her continued stay at Victoria Gardens since her hospitalization in 2006. Ms. Wolfe passed away in December 2010 and her son, Edward, as representative and executor of her estate, was substituted as plaintiff.

## ANALYSIS

I. **Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quotations omitted). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

"When both parties file motions for summary judgment, the court applies the same standards of review." *Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute v. M/V NOBILITY*,

177 F. Supp. 2d 411, 414 (D. Md. 2001) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983)). "The role of the court is to 'rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (quoting *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985)).

## II. Motions to Strike Experts and Evidence

Before assessing the evidence the parties have adduced to support their respective motions for summary judgment, it is necessary to briefly address their motions to strike the other party's "expert designations."[2] Wolfe moves to strike the independent report authored by Dr. Francis J. Foca, at the request of the Maryland Insurance Administration, assessing CareFirst's denial of the claim at issue in this case (IPRO Report, ECF Nos. 124-8 & 144). Wolfe contends that the report is unreliable ("a farce") and that it was not timely produced in discovery. In its response, CareFirst states, and Wolfe does not contest, that Wolfe has been in possession of the report since 2009 and that he produced the report to CareFirst in 2011. In addition, CareFirst has submitted a sworn affidavit by Dr. Foca that states he is the author of the report and that it is "an independent medical review of a complaint filed with the Maryland Insurance Administration by Florence Wolfe, a resident of Texas, regarding her claim for benefits under a Catastrophic Health Expense Policy issued to her by CareFirst." (Foca Aff., ECF No. 143-2, ¶¶ 2-3.) The affidavit also lists Dr. Foca's extensive medical credentials which corroborate those contained in the IPRO report. (*Id.* ¶¶ 6-15.) The court is satisfied that CareFirst did not improperly withhold discoverable information from Wolfe and that the IPRO Report is reliable, admissible evidence

---

[2] Neither party has apparently designated an expert witness, but both rely on expert opinions and testimony to support their motions for summary judgment.

written by a qualified medical expert. Accordingly, Wolfe's motion to strike the IPRO Report will be denied.[3]

Likewise, CareFirst moves to strike Wolfe's submission of testimony by Dr. George M. Markus, although Dr. Markus is a qualified, veteran doctor, because he apparently did not read the CareFirst policy or any of Ms. Wolfe's medical records from Victoria Gardens prior to the morning of his deposition. To the extent that Wolfe seeks to admit testimony by Dr. Markus stating that the treatment Ms. Wolfe received at Victoria Gardens was medically necessary, not custodial care, and covered by the policy, such testimony is inadmissible because Dr. Markus did not have sufficient knowledge of Ms. Wolfe's treatment at Victoria Gardens to offer an opinion characterizing it.

Under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), expert testimony must be "reliable," and this determination "depend[s] upon the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). While the court does not agree with CareFirst's hyperbolic assertion that all of Dr. Markus's testimony is "irrelevant, unreliable, unqualified, speculative, specious, lack[ing] any foundation whatsoever, and could only result in grossly misleading/prejudicing a jury," (Def.'s Mem., ECF No. 133-1, at 2), Dr. Markus's testimony on certain matters is unreliable. Dr. Markus is a thirty-

---

[3] Wolfe's motion for leave to depose Dr. Foca will also be denied. As explained below, the CareFirst policy did not cover most of Ms. Wolfe's care at Victoria Gardens, in part, because she was not hospitalized "for" Alzheimer's prior to her admission to the ECF, and Dr. Foca's testimony would have no direct bearing on that issue. Furthermore, Wolfe's untimely declaration under Fed. R. Civ. P. 56(d) does not justify a need to depose Dr. Foca. Although the identity of the IPRO Report's author may have been confusing, the report speaks for itself and is reliable. It is implausible that Wolfe did not anticipate CareFirst would rely on the report in its summary judgment motion, and Wolfe made no submission under Rule 56(d) prior to filing his brief opposing summary judgment. It is also unclear what additional facts would be gained by deposing Dr. Foca that would assist Wolfe in challenging the conclusions of IPRO Report.

year veteran physician and was Ms. Wolfe's primary doctor until she entered the nursing home, so he is perfectly qualified to offer expert opinion testimony concerning Ms. Wolfe's medical needs, her diagnosis at the time she was admitted to the nursing home, and the care she received during the hospital visit that precipitated her entering the nursing home. As Ms. Wolfe's physician, Dr. Markus's opinion on these matters is sufficiently reliable. *Cf. Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) ("[T]he opinion of a claimant's treating physician . . . is entitled to great weight for it reflects an expert judgment based on continuing observation of the patient's condition over a prolonged period of time.") However, Dr. Markus apparently had no interaction with Ms. Wolfe after her hospitalization in 2006, and he reviewed no more than a few pages of her Victoria Gardens medical records from June and August 2009 before providing his opinions. (*See* Markus Dep. at 40-41, 50-52, 83.) Therefore, opinions that Dr. Markus offers regarding Ms. Wolfe's treatment *at* Victoria Gardens are not reliable. Accordingly, CareFirst's motion to strike Dr. Markus's testimony will be granted in part and denied in part.

### III.   Motions for Summary Judgment

CareFirst disputes those claims (the vast majority) for Ms. Wolfe's care at Victoria Gardens during times, both parties agree, the *only* illness or injury for which she was receiving treatment was Alzheimer's disease. CareFirst agrees that for a few isolated periods, as the IPRO report found, Ms. Wolfe's treatment at Victoria Gardens was covered because she was receiving care for additional illnesses or injuries for which she had previously been admitted to the hospital, as required by the policy. Therefore, summary judgment turns on whether the care Ms. Wolfe received for Alzheimer's disease at Victoria Gardens was covered by the policy. If it was, a genuine dispute of material fact exists as to whether Ms. Wolfe incurred enough expenses to trigger the policy coverage—Wolfe has submitted a declaration and spreadsheets which appear

to support the amounts claimed (ECF No. 128-7), but CareFirst disputes them. If Ms. Wolfe's treatment for Alzheimer's at Victoria Gardens was not covered, however, both parties agree that the deductible threshold would not have been met.

In Maryland, "insurance contracts are construed as ordinary contracts." *Dutta v. State Farm Ins. Co.*, 769 A.2d 948, 957 (Md. 2001) ("Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer.") (citations omitted). However, "under general principles of contract construction, if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument*." *Id.* (emphasis in original) (quotation omitted). "An insurer has the burden of establishing that the policy excludes a particular loss." *Bao v. Liberty Mut. Fire Ins. Co.*, 535 F. Supp. 2d 532, 535 (D. Md. 2008) (citing *Nat'l Elec. Mfrs. Assoc. v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 824 (4th Cir. 1998)).

Under her CareFirst policy, in order for Ms. Wolfe's treatment at Victoria Gardens for Alzheimer's to be covered: (1) Alzheimer's must be a covered illness; (2) Ms. Wolfe must have been hospitalized "for" Alzheimer's for at least a three-day period and her admittance to Victoria Gardens, an ECF, must have occurred within 14 days after such a hospitalization; (3) the treatment she received at Victoria Gardens must have been "medically necessary" for treatment of her Alzheimer's; and (4) her treatment at Victoria Gardens must not have been "mainly . . . custodial care," as defined by the policy. (*See* Policy at 11, 20, 22.) Wolfe has adduced no evidence rebutting CareFirst's showing that Ms. Wolfe was not hospitalized "for" Alzheimer's prior to her admission to Victoria Gardens. In addition, Wolfe does not have sufficient evidence to rebut CareFirst's showing that much of Ms. Wolfe's treatment was not "medically necessary"

but rather was "mainly" custodial care under the policy. Thus, CareFirst is entitled to judgment as a matter of law.

### (1) Alzheimer's disease

CareFirst first argues that, setting aside the rest of the policy, Ms. Wolfe's claims were not covered because Alzheimer's is a "mental condition" that is not "amenable to improvement through treatment," and thus, is excluded from the policy. (*See* Policy at 26.) CareFirst's argument is without merit.

First, the "mental health" policy provision that CareFirst cites seeking to *exclude* Alzheimer's as a covered illness falls under the listing of the plan's *included* benefits. The provision lists "an emotional disorder" and "[a]lcohol and drug abuse" as two examples of mental illnesses that are *covered* under the plan. While it is true that "mental condition[s]" that are not "amenable to improvement through treatment" are not covered, it is implausible that a degenerative brain disease like Alzheimer's falls under this "mental health" category. CareFirst's own optional Alzheimer's policy rider, which it included in one of its pleadings for a different purpose, defines Alzheimer's as "a progressive brain disease" that must be diagnosed by an "attending physician," not a mental health specialist or psychiatrist. (*See* ECF No. 134-2.) Despite CareFirst's assertion to the contrary, the American Psychiatric Association (APA), in the Diagnostic and Statistical Manual of Mental Disorders III and IV-Text Revision (DSM-III; DSM-IV-TR), has stated that Alzheimer's has an organic, or physical, cause. The DSM-III, which was published over 30 years ago, lists Alzheimer's as an "organic" disorder. *See* APA, DSM-III 124 (3rd ed. 1980). The DSM-IV-TR describes physical tests and scans that may be performed to detect changes in the brain that are manifestations of Alzheimer's. APA, DSM-IV-TR 156 (4th ed. 2000). To the extent that certain purely "mental" illnesses or conditions, like

emotional disorders, are subject to the limitations of the policy's "mental health" provision, Alzheimer's is a physical illness with physical causes, not a "mental" one, and those limitations do not apply.[4]

Despite its suggestion otherwise, the cases cited by CareFirst confirm that Alzheimer's is *not* a "mental illness." In *Heaton v. State Health Benefits Com'n*, a New Jersey appellate court recognized that Alzheimer's was a "medical condition," "an organic mental disorder caused by a progressive degeneration of brain cells," and that "[t]here is no dispute that Alzheimer's is a physical condition . . ." 624 A.2d 69, 71-72 (N.J. App. 1993) (holding that even though an insurance claim was for psychiatric treatment, the policy's mental illness limitation did not apply to Alzheimer's). In *Johnson v. General American Life Ins. Co.*, the court distinguished the issue there, involving the application of the term "mental illness" to depression allegedly caused by a heart condition, from the issue in *Heaton*, because "application of the term [mental illness] to Alzheimer's . . . is problematic." 178 F. Supp. 2d 644, 656 (W.D. Va. 2001). As these cases indicate, the CareFirst policy should not exclude Alzheimer's as a covered illness simply because it is a degenerative disease that causes psychiatric symptoms. And, if any remaining ambiguity in the term "mental condition" persists, it must be construed against CareFirst. *See Dutta*, 769 A.2d at 957.

Furthermore, the unfortunate fact that Alzheimer's has no "cure" cannot serve as a basis for denying patients with the disease medical coverage. Interpreting the policy in this way would have significant consequences for patients with a range of degenerative illnesses, like Alzheimer's, that are amenable to treatment but are incurable. *See also Burgin v. OPM*, 120 F.3d

---

[4] The DSM-IV-TR also laments the use of the term "mental disorder" because it "unfortunately implies a distinction between 'mental' disorders and 'physical' disorders that is a reductionistic anachronism of mind/body dualism." *See* DSM-IV-TR at xxx.

494, 498-99 (4th Cir. 1997). In short, the mere fact that Ms. Wolfe was being treated for Alzheimer's does not justify the denial of her claims.

**(2) Hospitalization**

Treatment at an ECF is covered under the CareFirst policy only if the insured enters the ECF within 14 days of a three-day or longer covered hospitalization and the "ECF stay is for continued treatment of the same illness or injury for which benefits are eligible under the policy." (Policy at 20.) The claims for Ms. Wolfe's treatment at Victoria Gardens for her Alzheimer's rest entirely on her five-day hospital stay in November 2006, after which she was discharged directly into the ECF for care. Thus, her "continued" treatment at Victoria Gardens for Alzheimer's would be covered only if the initial hospital stay was "for" the treatment of Alzheimer's.

Wolfe has not adduced evidence from which a reasonable jury could conclude that the initial hospital stay was "for" the treatment of Alzheimer's. The evidence in the record shows only that it was "for" the treatment of dehydration, syncope (fainting), and injuries from a resulting fall. The medical records from the hospital stay and Dr. Markus's testimony indicate that Ms. Wolfe was admitted for injuries sustained from a fall related to syncope and that she was dehydrated when she was admitted. (Markus Dep. at 57-58; ECF No. 127-1.) Upon discharge, Ms. Wolfe's diagnoses included "[s]yncope, etiology unclear" (meaning the source of the fainting was never firmly diagnosed), as well as dehydration, a fracture, anemia, and Alzheimer's, (ECF No. 127-1), but she had been diagnosed with Alzheimer's by Dr. Markus prior to this hospitalization. (Markus Dep. at 31, 60-61.) Dr. Markus suggests that Ms. Wolfe's fall may have been related to her inability to care for herself because of her Alzheimer's, but he

11

never directly diagnosed Alzheimer's as the cause of her fall. (Markus Dep. at 59-62.) As the hospital records reflect, the cause of the fall was unclear. (ECF No. 127-1.)

In fact, Dr. Markus stated that even if Ms. Wolfe was not suffering from Alzheimer's, he would have admitted her to an ECF because of her fracture. (*Id.* at 64-65.) So, the link between the hospitalization and her initial entry into the ECF was limited to the injury Ms. Wolfe sustained that, at most, *related* to her Alzheimer's. But, her initial hospitalization was not "for" the treatment of Alzheimer's. This is also the view expressed in the IPRO Report. (ECF No. 144.) Thus, CareFirst has shown that even if Ms. Wolfe received continuous treatment for Alzheimer's during her entire stay at Victoria Gardens, this treatment was not for the same illness for which she was hospitalized prior to the ECF, and CareFirst did not breach the insurance contract in denying coverage.

### (3) "Medically Necessary" and "Custodial Care"

CareFirst also asserts that the care Ms. Wolfe received at Victoria Gardens was not "medically necessary" under the policy, but rather constituted "custodial care," which is not covered.[5] Determining whether treatment is "medically necessary" under the policy requires expert testimony because such a determination must be based on medical knowledge "beyond the ken of the average layman." *See Hartford Acc. and Indem. Co. v. Scarlett Harbor Assoc. Ltd. Partnership*, 674 A.2d 106, 125-26 (Md. App. 1996); *see also Wright v. Smith*, 641 F. Supp. 2d 536, 540-41 (W.D. Va. 2009). Dr. Foca, in the IPRO report, identified certain time periods when

---

[5] The policy defines "custodial care" as:
> [C]are, as determined by [CareFirst], that is not directed towards the cure of an illness or directed towards an insured's recovery from an accident, and is mainly for meeting the activities of daily living, e.g. bathing, toileting, and eating. Custodial care is not routinely provided by a trained medical professional and may be provided by persons without professional medical skills or professional medical training. In some instances custodial care may be ordered by a physician, necessary to maintain the insured's present condition, or covered by Medicare. (Policy at 29.)

Ms. Wolfe was receiving medically necessary treatment at the ECF. This care was principally rehabilitative after a fall and serious illness, aimed at restoring Ms. Wolfe to her prior level of functioning, and CareFirst no longer challenges coverage of these time periods. Otherwise, Dr. Foca agreed with CareFirst's determination that the remaining care Ms. Wolfe received at the ECF (the vast majority) was not covered by the policy. To the extent that Dr. Markus offers a contrary opinion, it is not based on any record review or firsthand knowledge and, therefore, is not reliable, as stated above. In any event, much of Dr. Markus's testimony demonstrates only that Ms. Wolfe required care at Victoria Gardens for close monitoring and assistance in "the activities of daily living." (*See, e.g.*, Markus Dep. at 66, 86).[6]

## **CONCLUSION**

For the above reasons, Wolfe's motion for partial summary judgment will be denied and CareFirst's motion for summary judgment will be granted.

A separate Order follows.

| | |
|---|---|
|     1/4/13     |     /s/     |
| Date | Catherine C. Blake |
| | United States District Court |

---

[6] For example, when asked to explain why Ms. Wolfe required care at Victoria Gardens, Dr. Markus elaborated that she "needed somebody to watch her blood pressure. Somebody to make sure she wasn't being overmedicated. Somebody needed to make sure she was taking in enough fluids so that she didn't pass out, fall to the floor and break another bone." (*Id.* at 86.) CareFirst's counsel asked whether "she was in the nursing home because her Alzheimer's, her chronic disease, was preventing her from taking care of her daily living[,]" and Dr. Markus answered, "Yes." (*Id.*)